595 F.Supp. 414 (1984)
CENTRAL HARDWARE COMPANY, a corporation, Plaintiff,
v.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and Loran W. Robbins, Marion M. Winstead, Harold J. Yates, Earl L. Jennings, Jr., Howard McDougall, Robert J. Baker, Arthur H. Bunte, Jr., and R.V. Pulliam, Sr., as Trustees of the Central States, Southeast and Southwest Areas Pension Fund, and George W. Lehr, Executive Director of the Central States, Southeast and Southwest Areas Pension Fund, Defendants.
No. 83-2322C(A).
United States District Court, E.D. Missouri, E.D.
August 15, 1984.
*415 *416 Keith E. Mattern, Lynn Chipperfield, St. Louis, Mo., for plaintiff.
Alan M. Levy, Chicago, Ill., Donald J. Weyerich, St. Louis, Mo., for defendants.

MEMORANDUM OPINION
HARPER, District Judge.
This matter is before the Court on the request of plaintiff, Central Hardware Company, for declaratory and injunctive relief against defendants, Central States, Southeast and Southwest Areas Pension Fund, its trustees and director.
This Court is vested with jurisdiction over the parties and subject matter pursuant to 29 U.S.C. § 1132(e), 15 U.S.C. §§ 15(a), 26, and 28 U.S.C. §§ 1331, 1337(a).
The controversy between the parties concerns whether plaintiff and its employees, as a bargaining unit, may choose to retain only the present employees as members of defendant pension trust fund, while placing future employees in a completely different plan. Plaintiff's complaint for declaratory and injunctive relief alleges a breach of contract by defendants in rejecting the collective bargaining agreement which provided for the "split" unit, tortious interference with the contractual relationship between Central Hardware Company and its employees, and finally, that defendants' actions constitute violations of the Sherman Antitrust Act, Sections 1 and 2.
The case was tried to the Court without a jury on March 26, 1984. The following constitutes this Court's findings of fact and conclusions of law:
Plaintiff, Central Hardware Company, is a corporation incorporated under the laws of the State of Missouri and has its principal place of business in St. Louis County, Missouri. Plaintiff's warehouse employees who are involved in this matter belong to Teamsters Local Union No. 688 (hereinafter referred to as Local 688).
Defendant, the Central States, Southeast and Southwest Areas Pension Fund (hereinafter referred to as the Fund), is a Taft-Hartley trust fund established for the purpose of managing, investing, controlling and disbursing assets under the terms of a Trust Agreement entered into on March 16, 1955, between certain trustees, various employers and local unions of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, on behalf of and to provide benefits to employee participants and their beneficiaries.
The Fund operates in approximately 34 states, services approximately 300 local unions, has approximately 25,000 contributing employers, and has over 460,000 participating employees, both active and retired.
Defendants Robbins, Winstead, Yates, Jennings, McDougall, Baker, Bunte and Pulliam are trustees of the Fund, and defendant Lehr is the executive director of the Fund.
The Central States, Southeast and Southwest Pension Plan (hereinafter referred to as Pension Plan) is a formal document prepared by the Trustees under Article VII of the Trust Agreement. The Plan and the Fund were formed pursuant to and operate subject to the Employee Retirement Income Security Act, the Internal Revenue Code, and other applicable federal law.
Central Hardware Company is an "employer," Local 688 is a "Union," and the Trustees are "Trustees," as set forth in the Trust Agreement.
Plaintiff and Local 688 have entered into collective bargaining agreements since 1959. Prior to May of 1979, these agreements have provided for payment by plaintiff to defendant Fund of contributions for all members of the bargaining unit at a uniform rate after thirty days of employment.
In May of 1979, plaintiff and Local 688 began negotiations for a new collective bargaining agreement to cover the period from May, 1979 through May, 1982. At these negotiations, plaintiff sought to discontinue its contributions to defendant Fund, and transfer the employees to a new company-sponsored plan. Despite the above, plaintiff and Local 688 agreed that plaintiff would continue to make payments to defendant *417 Fund for all of the employees in the bargaining unit during the term of the agreement.
In 1980, plaintiff and Local 688 began new negotiations because of plaintiff's contemplation of moving its warehouse operations out of the St. Louis area. In contemplation of Central Hardware Company's proposed move, and in order to preserve the jobs of its members, Local 688 agreed to enter into a Memorandum of Understanding, dated July 10, 1980, which provided, in part, for a withdrawal of the bargaining unit from defendant Fund, and a transfer of all or part of the unit to the Teamsters Negotiated Occidental Pension Plan.
The Teamsters Negotiated Occidental Pension Plan (hereinafter referred to as the Teamsters Fund) is a pension fund established pursuant to collective bargaining agreements between various employers and local teamsters unions on behalf of and to provide benefits to employee participants and their beneficiaries. The Teamsters Fund maintains its principal place of business in St. Louis, Missouri.
The Memorandum of Understanding referred to above predated the Multi-employer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1322a et seq. (hereinafter referred to as MPPAA). MPPAA provides substantial withdrawal liability upon termination by a pension fund of a bargaining unit's right to participate. Defendant Fund has alleged a withdrawal liability on the part of Central Hardware Company in the amount of $727,828.89 as of March 7, 1984.
In light of the possible withdrawal liabilities it might incur, plaintiff changed its position on its association with defendant Fund, believing that a gradual withdrawal from defendant Fund would not trigger the liability provisions of MPPAA. The new position taken by plaintiff sought to continue all employees hired before May 19, 1982 in defendant Fund, but proposed that all employees hired after May 19, 1982 be in the Teamsters Fund or a company-sponsored plan.
The overall purpose behind the shift to a different pension plan is a lower cost to plaintiff. Plaintiff alleges that a twenty-dollar weekly contribution to the Teamsters Fund would secure for employees the same level of benefits as a weekly contribution of forty-six dollars to defendant Fund. Local 688, however, called for continuation of all warehouse employees in the Central States Pension Plan.
At the negotiations for the 1982-85 collective bargaining agreement, Local 688 conceded on the pension issue and agreed to contributions to the Teamsters Fund on behalf of all newly hired employees. Part of this concession, however, required that another Memorandum of Understanding be executed. This Memorandum, dated June 7, 1982, provided, in Part:
"* * * if the exclusion from the Central States Pension Plan of persons hired by Central Hardware after May 19, 1982, and covered by this Collective Bargaining Agreement violates the terms and provisions of the Central States Pension Plan in existence and effect on May 19, 1982, then effective for contributions after Central Hardware's receipt of a final determination of such a violation, the Central States Pension Plan shall be substituted for the Teamsters Negotiated Pension Plan in the preceding."
The "final determination of such a violation" referred to in the preceding quoted paragraph contemplates a judicial determination.
On May 19, 1982, a collective bargaining agreement was entered into for the period covering May 19, 1982 to May 31, 1985. This new agreement provided for the split in the bargaining unit for pension plan purposes.
On May 19, 1982, seventy-eight of plaintiff's warehouse employees were members of Local 688, and since May 19, 1982, approximately seventeen new full-time warehouse employees have been hired by plaintiff, all of whom are members of Local 688.
On October 25, 1982, defendant Trustees informed plaintiff that the proposed 1982-85 collective bargaining agreement was not *418 acceptable, and that if the collective bargaining agreement were not amended, the participation of the bargaining unit in defendant Fund would be terminated. It is this action by the Trustees of which plaintiff complains.
The basis for defendants' rejection of the 1982-85 collective bargaining agreement is found in the language of the Trust Agreement, the Pension Plan and in a Special Bulletin promulgated by the Trustees.
The recital of the 1979 Trust Agreement states:
"* * * the Trustees declare that they will receive and hold the contributions and any other money or property which may come into their hands as Trustees, * * * with the powers and duties, uses, and purposes as hereinafter set forth * * *."
Article I, Section 1 of the Trust Agreement defines an employer as "any employer who is bound by a collective bargaining agreement with the Union, * * * who satisfies the requirements for participation as established by the Trustees and agrees to be bound by this Agreement."
Article IV, Section 1 provides that "[t]he Trustees shall have authority to control and manage the operation and administration of the Trust in accordance with applicable law."
Under Article IV, Section 9, the Trustees are "* * * authorized to formulate and promulgate any and all necessary rules and regulations which they deem necessary or desirable to facilitate the proper administration of the Trust."
Section 9 also provides that "[a]ll rules and regulations adopted by action of the Trustees for the administration of the Trust Fund shall be binding upon all parties hereto, all parties dealing with the Trust, and all persons claiming any benefits hereunder."
Article IV, Section 14(e) authorizes the Trustees "to do all acts, whether or not expressly authorized herein which the Trustees may deem necessary or proper for the protection of the property held hereunder."
In October of 1977, the Trustees passed Special Bulletin Number 20. No copies were sent to any contributing employers, nor to the plaintiff. Special Bulletin Number 20 reads as follows:
"TO: ALL LOCAL UNIONS WITH MEMBERS PARTICIPATING IN THE CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND.
"The Full Board of Trustees at their August 17, 1977 meeting adopted the following resolution in order to prohibit acceptance of collective bargaining agreements considered detrimental to the actuarial soundness of the Pension Fund: "WHEREAS, the Board of Trustees (the `Trustees') of Central States, Southeast and Southwest Areas Pension Fund (the `Fund') have determined that there exists a need to establish a uniform policy for payment of employer pension contributions; and
"WHEREAS, the Trustees of the Fund have determined that this policy is required in order to preserve and protect the interests of the participants and beneficiaries of Central States, Southeast and Southwest Areas Pension Plan (the `Pension Plan'):
"NOW, THEREFORE, BE IT RESOLVED by the Trustees of the Fund, in meeting assembled, that effective immediately staff shall be authorized and directed to refuse to accept any collective bargaining agreement or renewal thereof if the terms and conditions thereof provide that the employer may differentiate the amount of pension contributions among employees working under that collective bargaining agreement or a supplement thereto, notwithstanding their classification or employment, by using any of the following points of difference as the measure for different contribution rates:
"a) the age of such employees;
"b) the length of service or seniority of such employees;

*419 "c) the employment commencement date of such employees;
"d) the amount of `Credited Service' (as defined in the Pension Plan) of such employees; or
"e) the likelihood of such employees to meet any of the prerequisites for any benefits defined in the Pension Plan."
Defendants maintain that the Trustees have established a policy which requires a uniform rate for all employees in the Central Hardware bargaining unit and, therefore, all contributions on behalf of all employees must be at the same rate. Defendant contends that the terms of the 1982-85 bargaining agreement would result in contributions for employees hired before May 19, 1982 totalling forty-one dollars per employee, while employees hired after that date would contribute nothing. In the second and third years of the agreement, plaintiff will have contributed forty-six dollars and fifty-one dollars per week, respectively, for employees hired before May 19, 1982, while the newer employees will have had nothing contributed for them.
Defendants further assert that the proposed shift of employees hired after a certain date to a different fund would violate the actuarial soundness of the plan and, therefore, the Trustees possess the authority, under Special Bulletin Number 20, to reject the proposed 1982-85 collective bargaining agreement. Defendants put forward evidence at trial on the detrimental effect that the proposed agreement would have on the Fund, and thus urge the Court to uphold their rejection of the agreement.
Plaintiff's complaint is for damages based on three separate alleged causes of action: Breach of contract, tortious interference of a contractual relationship, and violations of the Sherman Antitrust Act, Sections 1 and 2. The Court will now address these alleged causes of action in that order.
Plaintiff's breach of contract claim alleges a contractual duty on the part of the defendant Trustees to accept its contributions under the Pension Plan, the Trust Agreement and the 1982-85 collective bargaining agreement.
Article III, Section 1 of the Trust Agreement requires plaintiff to "make continuing and prompt payments to the Trust Fund as required by the applicable collective bargaining agreement between the parties."
Article III, Section 3 of the same agreement provides:
"The Trustees are hereby designated as the persons to receive the payments heretofore or hereafter made by the employers to the Trust Fund * * *. The Trustees agree to receive all such payments, * * * and to hold same in Trust hereunder for the uses and purposes of the Trust herein created."
Plaintiff maintains that nowhere in the Trust Agreement is discretion given to Trustees whether or not to accept contributions or to accept or reject a collective bargaining agreement. Irrespective of the propriety of this assertion, plaintiff's claim for breach of contract depends on applicable language found in the Pension Plan document.
Section 7.01 of the Plan requires that "[e]ach employer shall make continuing and prompt payments to the Trust Fund on behalf of each Employee in its Bargaining Unit as required by the applicable Collective Bargaining Agreement."
Section 1.06 defines an "employee" as "a person * * * who is employed under the terms and conditions of a Collective Bargaining Agreement * * * entered into between an Employer * * * and a Union * * and on whose behalf contributions are made or are presently required to be made to the Pension Fund by the Employer."
Under the 1982-85 collective bargaining agreement between plaintiff and Local 688, only employees hired before May 19, 1982 fall within the definition of "employee." Employees hired after May 19, 1982 are not deemed employees under the Plan because no contributions are made or are "required" to be made on their behalf. The question remains, however, whether the Trustees have the authority to *420 require participation of "non-employees" in the Plan.
The Trustees are vested with authority to "promulgate any and all necessary rules and regulations which they deem necessary or desirable to facilitate the proper administration of the Trust." Special Bulletin Number 20, set out above, was issued under this authority.
This Court cannot accept defendants' interpretation of Special Bulletin Number 20 as applied to the collective bargaining agreement proposed by plaintiff and Local 688. It is clear that the special bulletin was formulated to prevent a situation in which a collective bargaining agreement sets out a "split-rate" scheme whereby employees would make the maximum contribution level only for a long enough period of time to vest the employee at the maximum benefit level, and would then make smaller contributions for the balance of the term of employment. The language of the Special Bulletin, the examples set out therein, and testimony at trial, discloses that only the "split-rate" situation was intended to be prohibited by the Special Bulletin.
The distinguishing feature between the situation contemplated by the Special Bulletin and the facts sub judice is that none of the employees hired after May 19, 1982, are now, or likely ever will be, beneficiaries of or participants in the Central States Pension Plan. The Special Bulletin simply declines to administer contributions from an employer committed to a "splitrate" arrangement and is, therefore, inapplicable to the present controversy because a split-rate arrangement has not been proposed. No express authority to require participation of "non-employees" is present in the language of the Trust Agreement or Pension Plan, nor is there any cognizable reason to imply such broad powers.
The Trust Agreement requires the Trustees to accept contributions established by the collective bargaining agreement. Having no basis to reject plaintiff's payments to the Fund, defendant Trustees have exceeded their authority and breached the contractual duty placed upon them in the Pension Plan and the Trust Agreement.
Plaintiff's second count of its amended complaint states a cause of action for tortious interference with the contractual relationship between plaintiff and Local 688. Missouri law, which applies, requires a plaintiff to establish five elements in order to sustain this tort claim. These elements are:
1) A contract or a valid business relationship or expectancy; 2) Defendant's knowledge of the contract or relationship; 3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship; 4) The absence of justification; and 5) Damages resulting from defendant's conduct. Salomon v. Crown Life Ins. Co., 536 F.2d 1233, 1238 (8th Cir.1976), cert. denied, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976); C & M Developers, Inc. v. Berbiglia, 585 S.W.2d 176, 183 (Mo.App.1979).
Plaintiff has failed to sustain its burden on this claim. Assuming that a breach of contract occurred between plaintiff and Local 688, it is the opinion of this Court that defendant Trustees had sufficient justification in its rejection of the contributions and collective bargaining agreement to avoid liability in tort. The Restatement (Second) of Torts, Section 773, addresses the justification defense:
"One, who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction."
Defendant Trustees point to their fiduciary duty in administering the trust and its authority under the Trust Agreement and Pension Plan to formulate rules so as to *421 provide for an actuarially sound pension plan. In creating the Special Bulletin, the Trustees viewed a "split-rate" plan as detrimental to the actuarial soundness of the plan. If a collective bargaining agreement is deemed by the Trustees to violate the Special Bulletin, their only recourse is to decline to administer contributions from an employer committed to an arrangement which they view as violating that rule. See Central States, Southeast and Southwest Areas Pension Fund v. Chicago-St. Louis Transport Co., 535 F.Supp. 476, 480-81 (N.D.Ill.1982). Defendant Trustees declined to administer contributions in order to protect the interest they hold in maintaining an actuarially sound plan. If they had not declined to do so, from their point of view, this interest in administering such plan would have been destroyed.
Plaintiff's third cause of action alleges an attempt to monopolize, and monopolization of, trade or commerce in violation of Section 2 of the Sherman Antitrust Act. 15 U.S.C. § 2. At trial, plaintiff introduced evidence and raised issues which constituted allegations of a "tying arrangement," or per se violation of Section 1 of the Sherman Antitrust Act. 15 U.S.C. § 1. Plaintiff, in a post-trial brief, moved to amend its pleadings to conform to the evidence pursuant to Rule 15(b), Federal Rules of Civil Procedure.
This Court is of the opinion that the weight of the credible evidence supports a conclusion denying relief on any of these antitrust claims.
In order to sustain its burden that defendant Trustees have attempted to monopolize "any part of the trade or commerce among the several states" under 15 U.S.C. § 2, plaintiff is required to show defendants' specific intent to monopolize, and also a dangerous probability of success within a relevant product and geographic market. United States v. Empire Gas Corp., 537 F.2d 296 (8th Cir.1976).
Section 2 of the Sherman Antitrust Act provides two elements for a showing of an existence of a monopoly. These are, one, the possession of monopoly power in the relevant market, and, two, the wilful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-4, 16 L.Ed.2d 778 (1966).
Plaintiff has not sustained its burden as to the intent element in these causes of action. As explained above, it is this Court's view that defendant Trustees were acting, although eventually determined to be beyond their authority, to protect their interest (and duty) in maintaining an actuarially sound pension plan. Taking the Trustees' actions beyond that context, and to the extent that plaintiff alleges, could have an extremely adverse and unjustified effect on the lawful performance of their duties. Also, plaintiff has disclosed no case law containing even a remotely analogous situation to that at bar.
Plaintiff's last antitrust allegation, not pled in its complaint, is for a violation of Section 1 of the Sherman Antitrust Act in defendant Trustee's attempt to "tie" together the purchase of pension benefits for present employees with the purchase of benefits for future employees.
The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere. Jefferson Parish Hospital District No. 2 v. Hyde, ___ U.S. ___, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). The rule of "per se" unreasonable tying arrangements was first announced in International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), where the Supreme Court stated that tying arrangements "are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a `not insubstantial' *422 amount of interstate commerce is affected." Id. at 396, 68 S.Ct. at 15. Of course, a court must first inquire as to whether two separate products or services are involved in the alleged tying arrangement.
Plaintiff contends that two separate products are involved in this matter, pension benefits purchased for present employees, and pension benefits purchased for future employees. The question of whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items. Jefferson Parish Hospital District No. 2 v. Hyde, supra, 104 S.Ct. at 1562.
The Pension Plan's purpose is to provide benefits for plan participants and their beneficiaries. Distinguishing between present and future employees in attempting to establish two distinct products for the purpose of alleging a "tying" arrangement is to no avail. "The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity with the desired purchase of a dominant `tying' product, resulting in economic harm to competition in the `tied' market." Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953). A "tying" arrangement is not present because the arrangement proposed here does not link two distinct markets for products that are distinguishable in the eyes of consumers. Jefferson Parish Hospital District No. 2. v. Hyde, supra 104 S.Ct. at 1562. Plaintiff has failed to sustain its burden in proving a "tying" arrangement that constitutes an unlawful restraint of trade.
Accordingly, the Court finds that the defendant Trustees' rejection of Central Hardware Company's collective bargaining agreement of May 19, 1982, constitutes a breach of the Trustees' contractual obligations to plaintiff under the Trust Agreement, and it is ordered that the Trustees are enjoined from refusing or otherwise failing to accept payments from Central Hardware on behalf of the employees hired before May 19, 1982, as called for in the 1982-85 Collective Bargaining Agreement.